# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2022-0038, <u>State of New Hampshire v. Dennis Surprenant</u>, the court on August 17, 2023, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the oral arguments of the parties, and has determined to resolve the case by way of this order. <u>See</u> <u>Sup. Ct. R.</u> 20(2). The defendant, Dennis Surprenant, appeals his convictions for domestic violence second degree assault, <u>see</u> RSA 631:2, I(f), :2, III (Supp. 2022), attempted domestic violence second degree assault, <u>see</u> RSA 631:2, I(f), :2, III; RSA 629:1 (2016), domestic violence simple assault, <u>see</u> RSA 631:2-b, I(a) (2016), and criminal trespass, <u>see</u> RSA 635:2 (2016) (amended 2020). He argues that the Trial Court (<u>Nicolosi</u>, J.) erred when it sustained the State's objection to a question by defense counsel that asked the investigating officer's opinion regarding whether pressure placed on a person's neck sufficient to impair the ability to breathe would cause some type of marking. We affirm.

The jury heard the following evidence. The defendant and the victim began dating in September 2019, while she was living with her sister. The victim moved with her five-year-old daughter into an apartment in Manchester in November 2019. The defendant would frequently stay the night in her apartment, leaving during the day and returning later around "dinner time." On December 17, 2019, while cleaning her home, the victim found drug paraphernalia and a baggie that appeared to contain heroin. That afternoon, the defendant came to her apartment and then quickly left saying that he had "to make a phone call." When the victim became aware that he had been gone for a while, she went to a window and watched him exit his car and retrieve a baggie containing needles from its trunk. He then reentered the car. While the defendant was in the car with the window rolled down, the victim observed him injecting drugs.

When the defendant returned to the apartment, the victim told him that she had found his drug paraphernalia and thrown it out. She then told him that their relationship was over and to leave.

Later that same night, the victim awoke to her dog barking. Her daughter was sleeping in the bed with her. The victim left her bedroom to investigate and found the defendant in her apartment. She had not asked him to return. She surmised that he had entered through a broken window or that

he had used a key that she had lost. The defendant suspected that there was a male in the victim's bedroom and became agitated, asking her why she had blocked him on her social media accounts. The victim told the defendant that if he did not leave she would call the police. She attempted to return to her bedroom and lock the door behind her but the defendant followed her and overpowered her. He picked her up, threw her on the bed, and got on top of her. He put his hand over her mouth so that she could not continue screaming. As the victim continued to struggle, the defendant put his hands on her neck and choked her until she could not breathe and her "eyes went black." When she woke up, the victim saw that the defendant was no longer on top of her and her daughter was on the dog bed "screaming for [the victim]." The victim called 9-1-1. When the defendant realized what she was doing, he grabbed the phone from her and threw it. He then began "freaking out" and punching himself in the face. The victim took a video of him doing so and later showed it to the responding officer. She explained at trial that she found his behavior "completely shocking" and recorded him "[i]n case he tried to say [she] did it."

The police arrived within ten minutes of the 9-1-1 call. Officer Blonigen testified that as he approached the apartment, he could hear a female yelling inside. When he knocked, the victim immediately opened the door, told him that they needed to remove the defendant from the apartment, and said that he had assaulted her. The defendant emerged from the apartment and remained with other officers while Blonigen spoke with the victim inside. When asked at trial, he observed that "you can hear on the body cam that she's - - she's fairly raspy." The victim's young daughter, who had been present during the assault, also reported to Blonigen that she saw the defendant "strangling Mama."

The defendant was arrested. He was subsequently charged with domestic violence second degree assault, and, as an alternative, attempted domestic violence second degree assault, as well as domestic violence simple assault, and criminal trespass. Following a jury trial, he was convicted on all counts.

On appeal, the defendant argues that the trial court erred in sustaining the State's objection during the following exchange:

> [DEFENSE COUNSEL]: Now, you would agree with me that, having investigated domestic violence cases before, in order to have somebody not be able to breathe while you're putting pressure on their neck that you would have to use a lot of pressure, correct?
> [OFFICER BLONIGEN]: Yes, that's correct.
> [DEFENSE COUNSEL]: And to put a lot of pressure on somebody's neck you would expect there to be some type of marking on the neck, right?

2

[PROSECUTOR]:  Objection, Your Honor.  I think this call is for expert opinions.

. . . .

[SIDEBAR DISCUSSION]

[DEFENSE COUNSEL]: I don't think it calls for an expert opinion if an officer had testified whether if somebody says that they had their throat being squeezed whether she says a mark there or not.

. . . .

THE COURT:  I'm going to sustain the objection.  It's either an expert opinion or it's something that would be unhelpful to the jury if it's in common.

The defendant contends that the trial court erred in its ruling because: (1) if the question called for an expert opinion, Blonigen had the requisite expertise; or (2) if the question called for the opinion of a lay witness, the trial court erred in ruling that Blonigen's response would be unhelpful to the jury.  Having so framed the issues, the defendant has not asked us to determine whether the challenged question called for expert or lay testimony; we therefore do not decide that issue.

We review the trial court's evidentiary ruling to determine whether its exercise of discretion is sustainable.  State v. Cochrane, 153 N.H. 420, 421 (2006).  We will affirm the trial court's ruling unless the defendant demonstrates that the ruling was untenable or unreasonable and that the error prejudiced his case.  Id.

We note that the defendant did not argue at trial that Blonigen was an expert.  Rather, when the State objected on the basis that the question called for an expert opinion, defense counsel responded: "I don't think it calls for an expert opinion . . . ."  During the ensuing sidebar, the court observed: "I guess he's offering it as a layperson testimony . . . ."

Notwithstanding the sidebar exchange, we will assume without deciding that the following issues have been preserved for our review: (1) whether Blonigen was qualified to offer an expert opinion on the challenged question; and (2) if not, whether it was error to exclude the question because it sought an unhelpful lay opinion.

New Hampshire Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:

3

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The preliminary question for the trial court when determining whether proffered expert testimony is admissible is "whether the witness, by either study or experience, has knowledge on the subject matter of his or her testimony so superior to that of people in general concerning it that his or her views will probably assist the triers of fact." State v. Newman, 148 N.H. 287, 291 (2002) (quotation omitted). "An established, widely-recognized corollary of this rule is that the party offering a witness as an expert has the burden of establishing the witness' qualifications." State v. Coleman, 133 N.H. 713, 715 (1990) (quotation and brackets omitted).

To support his argument that Blonigen possessed the requisite expertise to answer the question, the defendant contends that the State had earlier elicited opinion testimony from Blonigen that the injuries that he observed on the defendant "were consistent with the degree of force he saw on the cellphone video showing [the defendant] punching himself in the head." To the extent that this argument is based on the premise that Blonigen was qualified as an expert because he had already offered an opinion that only an expert could offer, we are not persuaded. Notably, the testimony was elicited without objection. Moreover, as the State points out and the following excerpt demonstrates, Blonigen was never asked about the "degree of force" that he observed on the cell phone video:

[PROSECUTOR]: Okay. Did you notice anything about [the defendant]'s face or appearance?
[BLONIGEN]: Yes. He had marks on his face and his head.
[PROSECUTOR]: And did he address those marks with you?
[BLONIGEN]: Yes, he did.
[PROSECUTOR]: And what did he say?
[BLONIGEN]: He stated that those marks were caused by a cousin of his that he got into a physical altercation with earlier -- earlier than this incident.
[PROSECUTOR]: Okay. Did anything that you had discovered during the course of your investigation up to that point lead you to doubt that statement?
[BLONIGEN]: Yes, it did.
[PROSECUTOR]: And what was that?

4

[BLONIGEN]: The video that I saw from [the victim] was consistent with the marks that I saw on [the defendant]'s face and head.

The defendant did not qualify Blonigen as an expert witness. Although he argues that his counsel established on cross-examination that Blonigen had received training in domestic violence cases, Blonigen never testified to investigating, learning about, or making arrests in domestic violence cases involving strangulation. Nor did he testify to any knowledge regarding the amount of pressure required to leave marks on a person's neck. Accordingly, assuming that the question called for an expert opinion, we conclude that the trial court did not unsustainably exercise its discretion by failing to treat the witness as an expert qualified to answer it.

The defendant also argues that, if the question did not call for an expert opinion, Blonigen could have answered it based on what he observed at the scene because he "was engaged in criminal investigation and could testify to an opinion informed by the knowledge he learned through his past work as a police officer." New Hampshire Rule of Evidence 701 limits the admission of a lay witness opinion to that which is:

(a) rationally based on the witness's perception;
(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

"Lay testimony is probative on the issue of physical injury and the cause of that injury only if the cause and effect are so immediate, direct and natural to common experience as to obviate any need for an expert medical opinion." Stachulski v. Apple New England, LLC, 171 N.H. 158, 168 (2018) (quotation omitted). "Expert testimony is required if any inference of the requisite causal link must depend on observation and analysis outside the common experience of jurors." Id. (quotation omitted). Assuming that defense counsel's question as to whether one would have expected there to have been observable marking on the victim's neck called for a lay opinion, it follows that the answer to that question did not rely upon observation or analysis outside the common experience of the jury. See id. Therefore, the jury was as capable of answering the question as was the witness. Although the trial court may permit lay opinion testimony when the witness's opinion is "helpful" to the trier of fact, N.H. R. Ev. 701, here the trial court could reasonably conclude that the jury, being capable of answering the question itself, had no need for Blonigen's lay opinion.[1] See State v. Cochrane, 153 N.H. at 421 (evidentiary rulings are

---

[1] We note that Blonigen testified that he did not remember seeing any red marks on the

within sound discretion of trial court). Thus, we conclude that the trial court sustainably exercised its discretion in ruling that, as a lay opinion, Blonigen's answer to the question "would be unhelpful to the jury."

<u>Affirmed</u>.

MACDONALD, C.J., and HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Timothy A. Gudas,**
**Clerk**

---

victim's neck, that he did not note any red marks in his police report, and that he would have noted them in his report if he had observed them. Moreover, in his closing argument to the jury, defense counsel argued that if the defendant had done the things with which he was charged, "there would be some signs of it --something would show up. If you're being that physical with someone, something would appear. And as you heard from the testimony of Ofc. Blonigen, . . . , he described no injuries whatsoever on [the victim] . . . ."